Hunter J. Shkolnik
Annie E. Causey
NAPOLI SHKOLNIK PLLC
1301 Avenue of the Americas, Floor 10
New York, New York 10019
Phone (212) 397-1000
Hunter@napolilaw.com
Acausey@napolilaw.com

Brittany Weiner
Jeanne Lahiff
IMBESI LAW P.C.
450 Seventh Avenue, Suite 1408
New York, New York 10123
Phone (212) 736-0007
Brittany@lawicm.com
Jlahiff@lawicm.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
MANZOOR MUMIN and VICTOR MALLH,
individually and on behalf of all others similarly situated,

|                                  |                                    |
|----------------------------------|------------------------------------|
|                                  | **15-CV-06143 (NGG) (VMS)**        |
| Plaintiffs,                      |                                    |
| v.                               | **THIRD AMENDED CLASS**            |
| UBER TECHNOLOGIES, INC. and RASIER, LLC, | **ACTION COMPLAINT**        |
| and JOHN DOES 1-10,              |                                    |
| Defendants.                      |                                    |

--------------------------------------------------------------X

Plaintiffs Manzoor Mumin and Victor Mallh ("Plaintiffs") allege on behalf of themselves

and classes of those similarly situated, as follows:

## INTRODUCTION

1.      This is an action by and on behalf of current and former Drivers ("Uber Drivers")

for Uber Technologies, Inc., a Delaware Corporation, and Rasier, LLC, a Delaware Limited

Liability Company ("Defendants" or "Uber") who are or were employed by Uber in the State of New York as "Independent Transportation Providers."

2.     Uber, a company valued at more than $50 billion, has and continues to take unfair advantage of its financially struggling Uber Drivers by terming them "Independent Transportation Providers."  Only in the counterfactual world could Uber Driver's be considered "independent."  Uber Drivers lack discretion in the performance of their employment relationship with Uber, and have no independence apart from Uber in performing their employment with Uber.

3.     Uber Drivers are able to secure fares only through Uber's mobile application, which governs every aspect of Uber Drivers' transportation services for Uber.  When Uber restricts a Driver's access to Uber's mobile application, Uber effectively terminates the Driver, as the Driver is unable to work for Uber or Uber's users.  Uber's misclassification of its Drivers as non-employees of the company has resulted in Uber Drivers' inability to earn minimum wage.

4.     Plaintiffs allege that they and other Uber Drivers are employees, and as employees, are entitled to basic wage protections such as expense reimbursement, overtime pay, rest- and meal-breaks, and other benefits that attach to employees that do not likewise attach to independent contractors. Uber misclassifies its drivers as independent contractors in order to evade these and other protections of New York Labor Law.

5.     Moreover, Uber intentionally misrepresents to the public how it compensates its Drivers so that it can retain a disproportionate percentage of the fares generated by Uber Drivers. Uber markets its rides as gratuity-included, but Uber does not remit the gratuity (or an amount in-kind) to Uber Drivers. Uber effectively takes the tips.  To worsen the reality for these Drivers,

Plaintiffs and members of the putative class finance all expenses related to their employment with Uber (*e.g.,* gas, cost of insurance, deductibles, and vehicle maintenance, among others).

6.       As Uber's employees, Plaintiffs and the class they seek to represent are owed fundamental wage protections that New York wage and hour laws afford other New York employees.  Plaintiffs seek damages and other appropriate relief on behalf of themselves and other similarly situated aggrieved individuals who have worked for or who are currently working for Defendants.

**PARTIES**

**Plaintiff**

7.       Plaintiff MANZOOR MUMIN is a citizen of the State of New York and a resident of the County of Queens.  Plaintiff previously worked for Uber as an Uber Driver.

8.       From November of 2011 to July of 2013, Mr. Mumin worked for Uber as an "Uber Black" driver.

9.       On average, Mr. Mumin worked approximately 55 hours each week throughout his employment with Uber, and Uber compensated Mr. Mumin on a weekly basis.

10.       On average, Mr. Mumin earned approximately $1,100 each week, and incurred $766 each week in expenses, including but not limited to gas, insurance a month, finance payments, cleaning, and car repairs, resulting in an effective hourly wage of $6.07, which reflects Mr. Mumin's total compensation as an Uber Driver.  From November 2011 until December 30, 2013 the minimum wage in New York was $7.25 per hour.  From December 31, 2013 until December 30, 2014, the minimum wage in New York was $8.00 per hour.

11.       Mr. Mumin's hourly wage was not at any time offset by expense reimbursement from Uber.

12.    Plaintiff VICTOR MALLH is a citizen of the State of New York.  Mr. Mallh works for Uber as an Uber Driver.

13.    Specifically, since June of 2015 and continuing, Mr. Mallh ahs worked for Uber as an "Uber Black" driver.

14.    On average, Mr. Mallh works approximately 70 hours per week, and Uber compensates him on a weekly basis.

15.    On average, Mr. Mallh earns $1,400 each week, and incurs $900 each week in expenses, including but not limited to gas, insurance, finance payments, car repairs, tolls, and cleaning costs, resulting in an effective wage of $7.14, which reflects Mr. Mallh's total compensation as an Uber Driver.  Currently, in New York, minimum wage is $9.00 per hour.

**Defendants**

16.    Defendant UBER TECHNOLOGIES, INC. is a Delaware Corporation headquartered in San Francisco, California.  Uber owns and operates the Uber ride sharing service and is authorized to conduct its business and does conduct its business throughout the State of New York.

17.    Defendant RASIER, LLC, a subsidiary of Uber, is a Delaware Limited Liability Company.  It is authorized to conduct business and does conduct business throughout the State of New York.

18.    Each of the Defendant JOHN DOES 1 - 10 is the agent, servant, partner, joint-venturer, coventurer, principal, director, officer, manager, employee, or shareholder of one or more of its co-defendant(s) who aided, abetted, controlled, and directed or conspired with and acted in furtherance of said conspiracy with one or more of its codefendant(s) in said co-defendant(s) performance of the acts and omissions described below. Plaintiffs name each of

4

these Doe Defendants by fictitious names because Plaintiffs do not know these Defendants'

actual identities and capacities. Despite reasonable efforts, Plaintiffs had not been able to

ascertain the identity of John Does 1-10.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(a) because the amount in controversy exceeds $75,000, and the parties are diverse, because

Plaintiffs are  citizens of the State of New York and Defendants are citizens of the State of

Delaware.

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(d) because the aggregate claims of the Class (as defined below) exceed the sum or value of

$5,000,000.00, there is minimal diversity of citizenship between Plaintiffs and Defendants, and

the class consists of more than 100 members.

21.     This Court has personal jurisdiction over Defendants because Defendants

intentionally avail themselves of the rights and privileges of conducting business in New York

and Defendants have continuous and systematic contacts with the State of New York.

22.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant

to 28 U.S.C. § 1367 because the state law claims are so closely related to the claims over which

the Court has original subject matter jurisdiction that the state law claims form part of the same

case or controversy.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as many of the

events and conduct giving rise to the claims occurred in this District, and because Defendants:

       a.       are authorized to conduct business in this District and have intentionally availed themselves of the laws and markets within this District through the promotion, marketing, distribution, and sale of their product in this District;

       b.       do considerable business in this District; and

       c.       are subject to personal jurisdiction of this District.

24.     Plaintiffs allege on information and belief that each Defendant acted in all manner relevant to this action as the agent of the other Defendant, carried out joint business plans and operations, and the acts and omissions of each Defendant are legally attributable to the other Defendant.

## FACTUAL ALLEGATIONS

25.     Defendants employ(ed) Plaintiffs and members of the Class, exercised control over their wages, their hours, and their working conditions.

26.     Defendants regulate every aspect of Uber Drivers' job performance.

27.     As with other employers, Defendants required Plaintiffs and Uber Drivers to submit to background checks, and to disclose banking information and residence, as well as social security numbers.

28.     Uber requires Plaintiffs and Uber Drivers to register their cars with Uber and the vehicles cannot be more than ten years old.

29.     Uber Drivers do not pay Defendants to use Defendants' intellectual property, the mobile application.  Uber Drivers do not, in the strictest sense, pay Uber a fee as consideration for use of Uber's mobile application.

30.     Rather, Defendants compensate their Uber Drivers based upon the employment arrangement that Uber unilaterally imposes upon its Drivers, a with any employment-based business model.

31.     Uber Drivers are not engaged in a business distinct from Uber's business.  The Uber application ensures this.  Through the application, Uber controls and directly manages Uber's entire transportation service, critically, inclusive of its Drivers.

32.     Plaintiffs' and  Uber Driver's ability to earn income depends solely on Uber and not in any way on an Uber Driver's particular skill or acumen, or on any managerial or other discretionary job skill.

**Uber Profits by Deceiving Consumers and Drivers.**

33.     Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application – an expense that Uber, the employer, should pay.

34.     Uber misleads Plaintiffs as to the amount of income that they could earn driving for Uber.  Uber told Plaintiffs that drivers can earn $2,000 a week by driving for Uber.  Plaintiffs did not earn the guaranteed hourly pay that Uber promised, regardless of the fact that the Plaintiffs work more than a 40-hour week.

/

/

/

/

/

/



35.     Even if a Driver could earn $2,000 a week, the advertisement and offer is deceptive and misleading because in reality, as evident from Plaintiffs' experience, after expenses and other costs improperly borne by Plaintiffs, Uber's Drivers make less than minimum wage, $9.00 an hour.

36.     Moreover, Plaintiffs and Uber Drivers do not receive (in-kind or otherwise) fare gratuity.

37.     Uber markets the rides in a manner that causes a reasonable belief that its Drivers are well compensated, and that as such, there's no need to tip.   Uber misleadingly states that gratuity is included in the total cost of the fare and that there is no need to tip the Uber Driver:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

38.     Uber also instructs its Drivers to decline acceptance of gratuity.

39.     Uber intentionally misrepresented that gratuity was included in the cost of fares and instructed passengers not to leave a tip in addition to the amount of the fare.

40.     Due to Uber's "there's no need to tip" mandate, Plaintiffs and Uber Drivers have sustained damages in the amount of gratuity that they would have received (even if in-kind) but for Uber's misrepresentation.

**Uber's Profit Model is Based Upon Misclassifying Drivers as Independent Contractors.**

41.     Uber uniformly misclassifies its drivers, including Plaintiffs, as independent contractors when they should be classified as employees.

42.     Uber is deeply involved in marketing its transportation services, qualifying and selecting Uber Drivers, regulating and monitoring their performance (including disciplining or terminating those who fail to meet its employment standards), and fare setting.

9

43.     Uber exercises absolute control over the qualification and selection of its Drivers. Before driving for Uber, applicants must complete Uber's application process, including background checks.

44.     Uber controls all work aspects of its Uber Drivers including Plaintiffs, concerning the manner, methods, and means of their provision of transportation services for Uber.  For example, upon signing an agreement to work for Uber, Uber required Plaintiffs to watch a video demonstrating how Uber requires them to interact with passengers.  Plaintiffs were also instructed on the Uber requirements for picking up customers.  Uber retains all necessary control over Plaintiffs' and Uber Drivers' performance.

45.     Uber monitors Plaintiffs and Uber Drivers to ensure compliance with Uber's quality control standards.  Uber requires all Drivers, including Plaintiffs, to maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars.  Requirements on how to improve a star rating are given to Uber Drivers that fall below this average in any given week.  If an Uber Driver fails to maintain an average customer rating of 4.5, Uber gives the Driver 30 days to raise her rating within the required threshold.  If the Uber Driver does not do so, Uber terminates that Driver's employment with Uber by deactivating the Driver's ability to use the application to pick up customers, and thus to continue to work.  Uber Drivers are also effectively fired from Uber's employment if they do not log a certain number of hours driving, as required by Defendants.

46.     Uber also unilaterally sets the fares—with no negotiation or input from Plaintiffs— for all rides, and Drivers are required to charge the cost determined solely by Uber. Uber bills customers for the entire amount before remitting payment to Uber Drivers.  Uber Drivers are paid by Uber.

47.     Uber claims a proprietary interest in its passengers, which further demonstrates that Uber acts as much more than an intermediary between passengers and Drivers.  For instance, Uber prohibits its Drivers from answering rider queries about booking future rides outside the Uber application, or from otherwise soliciting Uber riders.

48.     As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiffs and other similarly aggrieved driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments).  Uber also failed to keep accurate payroll records evidencing Plaintiffs' and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiffs and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service. Uber also fails to pay into any insurance fund, including Social Security, disability, and unemployment insurance.

**Violations of New York Labor Law**

49.     Plaintiffs allege that Uber has and continues to violate New York State Labor Law insofar as Uber (i) retains of gratuities (or in-kind amounts) intended for Driver employees in violation of Labor Law§ 196-d; (ii) fails to maintain required payroll records in violation of Labor Law § 195; and (iii) does not pay its Drivers minimum wage in violation of Labor Law §652.

**CLASS ALLEGATIONS**

50.     Plaintiffs commence this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of:

> All Uber Driver persons who have driven and/or continue to drive for Uber within
> the State of New York from 2011 and continuing.

51.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.  Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

52.    **Numerosity**:  The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. The precise number of such persons is unknown as the data required to calculate that number is presently within the sole possession, custody, or control of Defendants.  Upon information and belief, there are thousands of Uber Drivers in the State of New York, and thus in the proposed Class.

53.    **Commonality**:  There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members, including but not limited to:

a.    The policies, programs, practices, procedures, and protocols of Defendants concerning or relating to the Class members' actual and substantive work and job duties, their titles notwithstanding;

b.    Whether Defendants are and were subject to overtime wage requirements;

c.    Whether Defendants' policy and practice of classifying Class members as exempt from overtime wages under New York law and Defendants' policy and practice

of failing to pay overtime wages  violates applicable provisions of New York Labor Law, including applicable statutory and regulatory authority;

        d.       Whether Defendants' policy and practice of classifying Class members as exempt from overtime wages under federal law and Defendants' policy and practice of failing to pay overtime wages  violates applicable provisions of federal law;

        e.       Whether Defendants violated New York Labor Law by their policies, practices, and procedures concerning or relating to rest periods for the Class members;

        f.       Whether a gratuity is included in the total fare for Class members' services;

        g.       Whether Defendants were and are required to distribute the total proceeds of those gratuities to the Class members;

        h.       Whether Class members have suffered damages based upon Uber's representation to customers that there is no need to tip the drivers;

        i.       Whether Defendants improperly classified Class members as independent contractors rather than employees;

        j.       Whether Class members have been required to pay the expenses of their employment with Uber and whether Uber is required to compensate members of the Class for those expenses;

        k.       Whether Defendants have violated New York minimum wage law;

        l.       The proper measure of damages and the proper measure of restitution recoverable by Class members; and

        m.       Additional common questions of law and fact as developed during the discovery phase of this litigation.;

54.     **Typicality**:  Plaintiffs' claims are typical of the claims of the Class, as such claims could be alleged by any member of the Class, and the relief Plaintiffs seek is typical of the relief that Class members seek.  All of the Class members were subject to the same pattern and practice of Defendants as alleged herein.  Defendants' corporate-wide policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiffs and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices and procedures of the Defendants.

55.     **Adequacy of Representation:**  Plaintiffs are able to fairly and adequately protect the interests of the Class and have no interests adverse to the Class.  At all relevant times, Plaintiffs and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

56.     **Superiority**:  Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.  The losses, injuries, and damages are small as relevant to a class action analysis, such that without class treatment, individual action by each Class member would be cost-prohibitive.

57.     The Class members are also readily ascertainable.  For purposes of notice and other purposes related to this action, their names and addresses are known to Defendants.  The number and identity of the Class members are determinable from the records of Defendants.

58.     The representatives and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiffs' attorneys have sufficient financial resources and are willing to absorb the costs of the litigation.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF NEW YORK LABOR LAW

59.     Plaintiffs, on behalf of himself and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

60.     Uber's treatment of Plaintiffs and control exercised by Uber indicate that Plaintiffs are employees and not independent persons contracting with Uber.

61.     Plaintiffs allege that on an average workday, Uber Drivers receive approximately twenty ride requests through the Uber mobile application.  Once the request is received, the Plaintiffs have an option to either "accept" or "reject" the request.  Uber requires as a condition of employment with Uber that the Drivers accept approximately ninety percent of the requests. Accepting less than this threshold results in Uber deactivating the Drivers' account, and therefore, preventing the driver from receiving any rider requests.

15



/

/

/

/

/

/

/

## HOW ARE ACCEPTANCE RATES CALCULATED?

Acceptance rates are calculated as a percentage of the total number of requests you accept out of those sent to you while online.

Maintaining a high acceptance rate keeps the Uber system reliable for riders and drivers. You should accept at least 80% of trip requests to retain your account status.

Please note that a rider canceling a trip will never count against your acceptance rate.

62.     Rejecting a certain number of requests will negatively impact Plaintiffs' customer rating.  The employment agreement terms between Uber Drivers and Defendants, updated last on December 11, 2015, contains a provision that specifically states that the Uber Drivers' "failure to accept User requests for Transportation Services while [they] are logged in to the Driver App creates a negative experience for Users of Uber's mobile application."  If the customer rating falls below a 4.5, the driver faces termination from employment with Defendants, or a temporary deactivation of access to the Uber mobile application, *i.e.*, probation.

/

/

/

/

/

/

17



63.     Plaintiffs seek damages pursuant to New York State Labor Law for Uber's violations of the same, including:

a.      wrongful retention of portions of gratuities intended for Driver employees in violation of Labor Law§ 196-d;

b.      failure to maintain payroll records for Driver employees in violation of Labor Law § 195; and

c.      failure to remit minimum wage to Driver employees in violation of Labor Law §652.

64.     As a result of Uber's foregoing violations, Plaintiffs are entitled to recover associated with the wages and benefits withheld in violation of New York State Labor Law as well as attorney fees pursuant to New York State Labor Law § 198.  In addition, Plaintiffs seek the imposition of penalties on the Defendants Uber with respect to the applicable provisions of New York State Labor Law § 197 and § 215.

## COUNT II
## TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

65.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

66.     Uber interfered with the continuing business relationship between Drivers and fares—a separate relationship from that between either Uber and its Drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to Drivers, including Plaintiffs, absent Uber's interference.

67.     Uber intentionally and maliciously interfered with Plaintiffs and Drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

68.     Uber has stated to customers, on its website and in marketing materials, that a gratuity is included in the total cost of the car service and that there is no need to tip the Driver.

69.     For example, up until the end of 2012, Uber's website included such statements as "There's no need to hand your driver any payment and the tip is included" and "Please thank your driver, but tip is already included." Beginning in 2013, Uber's website has stated that "there is no need to tip."

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

70.     Even after the statements were apparently removed from the Uber's website at the end of 2012 that tips are included in the fare, Uber has nevertheless continued to inform passengers through marketing materials that tips are included in the fare. For example, as recently as at least April of 2015, Uber has sent promotion emails to customers, declaring that "payment is automatically charged to a credit card on file, with tip included."

71.     In addition, at various times (and at least through the end of 2012), Uber's contracts with its customers have incorporated by reference the statements and representations made on its website regarding pricing, which includes such statements as the "tip is included" in the fare. For example, Uber's contracts with its customers (at least through the end of 2012) contained such statements as: "The Company may change the fees for our Service or Software as we deem necessary for our business. We encourage you to check back at our website periodically if you are interested about how we charge for the Service of [sic] Software."

72.     However, despite Uber's representations to customers that the fare includes a gratuity (and despite Uber's contracts with customers that incorporated its pricing information on its website, including the website statements that "tip is included"), Uber drivers have not received the total proceeds of this gratuity.

73.     In reality, Uber collected gratuities and then failed to remit them to drivers.

74.     Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its drivers.

75.     Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

76.     Uber knew that this would be a benefit accruing to the Drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

77.     Uber's conduct damaged Plaintiffs and other drivers.

**COUNT III**
**BREACH OF CONTRACT**

78.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

79.     Uber has an implied in-fact contract with Plaintiffs and other Drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

80.     Plaintiffs and other Drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to Drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various webpages.  By entering into this agreement, customers intended to secure a financial benefit for Drivers, including Plaintiffs, in the form of gratuity and to act directly for the Drivers' benefit.

81.     At all times, Uber withheld and continues to withhold gratuities given by customers to Uber drivers and/or gratuities that are incorporated into the set fare. Uber has also failed to reimburse Plaintiffs for their employment related expenses.

82.     Uber's conduct damaged Plaintiffs and other drivers.

/

/

**COUNT IV**
**UNJUST ENRICHMENT**

83.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

84.     Defendants unlawfully retained gratuities promised to Plaintiffs and other drivers and failed to reimburse expenses.

85.     Defendants obtained these benefits from drivers by making material misrepresentations and taking advantage of them.

86.     As a result, Defendants has been unjustly enriched through their retention of a portion of the gratuities owed to the drivers.

87.     Plaintiffs and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities.

**COUNT V**
**CONVERSION**

88.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

89.     Plaintiffs and other Drivers have a superior right to possession of gratuities.

90.     Uber interfered with Plaintiffs' right to their personal property by refusing to relinquish the property to them.  Instead, Uber retained the property for its own benefit without Plaintiffs' permission.

91.     The converted property was personal.  For examples, the gratuities were specifically earmarked for the Drivers.

92.     Uber's conduct damaged Plaintiffs' and they are entitled to restitution for their full share of proceeds, as well as treble damages.

22

## COUNT VI
## FRAUD AND/OR INTENTIONAL OR NEGLIGENT MISREPRESENTATION

93.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

94.     Uber represented to Plaintiffs and other Drivers that they would receive gratuities, surge fares, and cancellation fees.  Uber did not pay these monies as promised.

95.     These misrepresentations were material because they affected Plaintiffs and other Drivers' decisions to continue driving for Uber.

96.     Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiffs and other Drivers based on its past practices of not doing so.

97.     Plaintiffs and other Drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was his employer and the party responsible for overseeing the payment of these monies.

98.     Uber's conduct damaged Plaintiffs and other Drivers.

## COUNT VII
## PROMISSORY ESTOPPEL

99.     Plaintiffs, on behalf of themselves and the proposed class, repeat and reallege all preceding paragraphs as if fully set forth herein.

100.    Uber promised to make certain payments, such as hourly wages, cancellation fees, and other payments, and to remit all gratuities to Plaintiffs and other drivers. Instead, Uber kept this money for itself.

101.    Based on its past practices of not paying tips to drivers, Uber knew at the time it made the promise that it was a lie.

102.   Plaintiffs and other drivers relied to their detriment on Uber's promise in continuing to drive for Uber and not seeking additional tips from passengers.

103.   Plaintiffs' and other Drivers' reliance was foreseeable because Uber—the entity that actually determines and pays drivers' compensation—made the false promise.

104.   Uber's conduct damaged Plaintiffs and other drivers.

105.   Injustice can be avoided only by enforcing Uber's promise to remit all gratuities to Plaintiffs and other drivers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class, requests relief against Defendants as follows:

a.   An award of damages, including compensatory, punitive, and treble damages,  in an amount to be determined at trial;

b.   Notice to the Class of this action;

c.   An injunction against Defendants prohibiting Defendants from continued unlawful practices, policies and patterns set forth herein;

d.   Liquidated damages, pursuant to New York Labor Law;

e.   Reasonable attorneys' fees and costs of this action;

f.   Pre-judgment and post-judgment interest as provided by law;

g.   Declaratory relief that Plaintiffs and members of the class are employees under the relevant law;

h.   An order directing Defendants to return to Plaintiffs any gratuities and any other funds wrongfully kept by Defendants; and

i.   Such other and further relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  New York, New York
       March 7, 2016

                                    Respectfully submitted,

                                    NAPOLI SHKOLNIK PLLC


                                    _/s/ Annie E. Causey _____

                                    Annie E. Causey
                                    Hunter J. Shkolnik
                                    1301 Avenue of the Americas, 10th Floor
                                    New York, New York 10019
                                    (212) 397-1000 (Phone)
                                    acausey@napolilaw.com
                                    hunter@napolilaw.com

                                    *and*

                                    IMBESI LAW P.C.


                                    __/s/ Brittany Weiner_____
                                    Brittany Weiner
                                    Jeanne Lahiff
                                    450 Seventh Avenue, Suite 1408
                                    New York, New York 10123
                                    (212) 736-0007 (Phone)
                                    (212) 658-9177 (Fax)
                                    brittany@lawicm.com
                                    jeanne@lawicm.com
                                    *Attorneys for Plaintiffs*

25